**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYCO ELECTRONICS** | : | **NO.: 1:10-cv-01807** |
| **CORPORATION,** | : | |
| **Plaintiff** | : | **JUDGE KANE** |
| **v.** | : | |
| | : | **MAGISTRATE JUDGE METHVIN** |
| **MILWAUKEE ELECTRIC TOOL** | : | |
| **CORPORATION,** | : | |
| **Defendant** | : | |
| | : | |

---

**REPORT AND RECOMMENDATION ON**
**PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS**
**AND STRIKE AFFIRMATIVE DEFENSES**
**(Doc. 35)**
**and PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO RULE 11**
**(Doc. 36)**

Before the court are two motions filed by plaintiff Tyco in this breach of

contract/unjust enrichment action: a motion to dismiss counterclaims and strike

affirmative defenses, and a motion for Rule 11 sanctions. On July 13, 2011, the court

referred the motions to the undersigned magistrate judge for report and recommendation.

(Doc. 51.) The motions are now ripe for adjudication.

*Findings and Conclusions*

**I. Procedural History**

Plaintiff, Tyco Electronics Corporation, manufactures electronic components,

including custom and specialty products. Milwaukee Electric Tool Corporation

("METCo") is a manufacturer and marketer of portable electronic power tools and

2

accessories. (*Id.* ¶¶ 6, 8.) For a number of years, METCo purchased switches for its products from Tyco.

Tyco filed the instant suit on August 30, 2010 for damages in the amount of $2.9 million as the result of purchase orders which METCo allegedly canceled in 2008. (Doc. 1.) The damages include component costs, finished goods, and a reasonable profit margin. Tyco's theories of recovery include breach of contract and promissory estoppel. The Court has diversity jurisdiction over this case under 28 U.S.C. § 1332.[1]

In its original Answer and Affirmative Defenses filed November 1, 2010, METCo admitted that it placed orders through Tyco's network, that the purchase orders contained the contract provisions alleged by Tyco, and that METCo had "adjusted" the orders (Doc. 12, ¶¶ 19-20, 26). METCo asserted a number of affirmative defenses, but did not allege that the contract dispute had been settled. (*Id.*, p. 9-11.)

After the close of pleadings, the parties attempted to mediate the dispute on March 30, 2011, but were unsuccessful. (Doc. 22). On April 11, 2011, Tyco filed a motion for partial judgment on the pleadings, seeking judgment on the issue of liability based on METCo's admissions in its answer. (Doc. 23). On April 12, 2011, the parties submitted a revised joint case management plan. (Doc. 24.) On April 13, 2011, the Court held a status

---

[1] Plaintiff Tyco is incorporated in and principally conducts business in Pennsylvania. (Tyco's Complaint and METCo's Amended Answer, ¶¶ 1–2, Docs. 1 and 33.)  Defendant METCo is a Delaware corporation with a principal place of business in Wisconsin. (*Id.* ¶ 3.)

3

conference. Pursuant to the discussions at the status conference, the Court issued an order

staying the case management deadlines for sixty days pending resolution of the motion for

judgment on the pleadings. (Doc. 26.) The Court also ordered that another status

conference be held on June 15, 2011. (*Id*.) On April 25, 2011, Tyco filed its brief in

support of its motion for judgment on the pleadings (Doc. 31). On the same day, METCo

filed a motion for leave to file an amended answer with counterclaims. (Docs. 29, 30.)

The court granted leave to amend, finding that METCo had been diligent in filing its

amended pleading, and that Tyco would not be unduly prejudiced. (Doc. 32.) The court

also denied as moot Tyco's motion for judgment on the pleadings, and lifted the stay (*Id*.)

On May 2, 2011, METCo filed its amended answer. (Doc. 33.)

In addition to various affirmative defenses, METCo's amended answer asserts four

counterclaims: I) breach of the purchase contract; II) breach of a "full or partial"

settlement agreement; III) promissory estoppel; and IV) unjust enrichment. (Doc 33, at

pp. 13-16.)

Tyco responded by filing the instant motion to dismiss Counterclaims II, III and IV,

and to strike ¶ 8 of METCo's affirmative defense which alleges a settlement. (Doc. 35.)

Tyco also filed a motion for Rule 11 sanctions. (Doc. 36.) METCo filed a consolidated

brief in opposition to both motions. (Doc. 43.) Tyco filed a consolidated reply brief. (Doc.

47.)

4

Tyco argues that in filing the delayed amended answer alleging a settlement, METCo is "essentially asking the court to believe that for six months they forgot that they settled a multi-million dollar dispute, but miraculously remembered this fact as soon as judgment against METCo was about to occur." (Doc. 47, at 8.) Tyco further argues:

> The assertion of a settlement defense for the first time in the Amended Answer is completely lacking in evidentiary support and was done solely to avoid a judgment of liability in response to Tyco Electronics' Motion for Judgment on the Pleadings. It is nothing more than an abusive and improper litigation tactic designed to delay the inevitable judgment against METCo for breach of the contract that it admits existed between the parties and admits it breached."

*Id*., at 7.

METCo responds that it has adequately alleged its counterclaims under the applicable rules, that its affirmative defenses are sound, and that Rule 11 sanctions are inappropriate in this case.

## II. Issues Presented

Tyco presents the following arguments in its two motions:

(A)     The court should dismiss Counterclaims II, III, and IV for failure to state a claim because (1) METCo fails to allege sufficient facts to present plausible claim of settlement; and (2) the indisputably authentic documents demonstrate that no settlement exists.

(B)     The court should strike METCo's affirmative defense based upon settlement of "all or some" claims (METCo's Amended Answer (Doc. 33, p. 9, ¶ 8).

(C)     The court should sanction METCo and its attorneys under Rule 11 for bringing unfounded claims alleging settlement.

5

## III. Discussion

### A. Documents which may be considered

A preliminary issue is what documents the court may consider in resolving the motion to dismiss. METCo attached to its counterclaims two letters relating to settlement negotiations between the parties. (Exhibits A and B, Doc. 33-1.) Tyco attached to its brief in support of motion to dismiss the same two letters plus six others related to settlement negotiations. (Exhibits A-H, Docs. 37-1 through 37-8).

It is well-settled that in deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Insur. Inc*., 998 F.2d 1192, 1196 (3d Cir.1993)(citations omitted); *see also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir.2007); *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). Considering material outside the pleadings and attachments generally requires the court to convert the motion to one for summary judgment so that the adverse party has an opportunity to respond. 5A CHARLES A. WRIGHT & ALAN MILLER, *Federal Practice and Procedure* § 1357 (2d ed. 1990). However, the court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit*, 998 F.2d at 1196 (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)). Furthermore, when a claim relies on a document, the claimant "obviously is

6

on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Id*. at 1196-1197. "A contrary holding would enable plaintiffs to survive a 12(b)(6) motion where the terms of the document on which the claim is based would render the complaint insufficient as a matter of law, simply by refusing to attach the document to the complaint." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 113 (3d Cir.)(Becker, J., concurring), *cert. denied*, 469 U.S. 831 (1984).

METCo alleges that the parties settled "all or part" of their dispute, and attached copies of two letters showing that the parties had engaged in settlement negotiations. (Doc. 33, at 14, ¶ 24; (Exhibits A and B, Doc. 33-1.) METCo can hardly argue that further evidence of the same negotiations should be barred. Both parties agree that they engaged in extensive settlement negotiations. The eight exhibits span a period of 2 ½ years, from July 2008 until December 2010 (suit was filed in August 2010). All eight letters reflect efforts by Tyco and METCo to negotiate a settlement of Tyco's claim for cancellation fees and other contractual items relating to METCo's cancelled purchase orders. Neither party disputes the authenticity of the exhibits.

Since METCo's counterclaims II, III and IV rely upon the factual assertion that the parties settled "all or part" of the claims at issue, the court may consider the letters without converting the motion to dismiss to a motion for summary judgment.

### B. Factual Background

For purposes of analyzing Tyco's motion to dismiss counterclaims, METCo's well-pleaded, nonconclusory factual allegations are accepted as true, and are viewed in the light most favorable to METCo. *See PPG Indus., Inc. v. Generon IGS, Inc.,* 760 F.Supp.2d 520, 524 (W.D.Pa.2011)("Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a complaint.") However, "factual allegations that constitute nothing more than 'legal conclusions' or 'naked assertions,'" must be disregarded. *Boland v. Select Comfort Corp.,* 2010 WL 3083021, *2 (M.D.Pa. Aug. 6, 2010) (Jones, J.).

The background facts are generally undisputed, except where noted. Tyco is a global provider of engineered electronic components for consumer and industrial products, including custom and specialty power tool switches. (Docs. 1 and 33, ¶ 6). For a number of years, Tyco supplied custom power tool switches to METCo, a manufacturer and seller of portable electric power tools.

On December 3, 2007, Tyco representatives hand-delivered to METCo a "Last Time Buy Letter" advising that Tyco was exiting the power switch business, and offering METCo a final opportunity to place switch orders. (Tyco's Complaint and METCo's Amended Answer, ¶¶ 12, 14-15, Docs. 1 and 33.) The letter stated that "[n]ew orders for Power Tool Switch products may be placed until close of business on February 15, 2008,"

and that "all existing or new orders must be shipped prior to August 29, 2008." (Exhibit A
to Complaint, Doc. 1, at 17).

METCo placed several purchase orders for switches in December 2007 and January
through February 2008. (Docs. 1 and 33,  ¶¶ 14, 17.) METCo's orders totaled
approximately $6.3 million. (Id., ¶ 17.) However, on April 21, 2008, METCo attempted to
cancel $5.8 million of the requested merchandise by faxing to Tyco copies of the
purchase orders with an "X" written across them along with the word "cancelled." (*Id.*
¶ 26.) On the same day, METCo "attempted to issue new purchase orders . . . for a
reduced quantity of approximately $1.7 million" of switches, even though the deadline for
orders was February 15, 2008. (Doc. 1, ¶¶ 27–28.) METCo admits only that it "sent Tyco
an adjusted purchase order." (Am. Answer ¶ 28, Doc. 33.)

According to Tyco, by the time of METCo's attempted cancellation, Tyco "had
purchased numerous custom components required to build products to fulfill METCo's
orders, had added additional labor in its manufacturing plant . . . and had begun
production to satisfy METCo's extensive orders." (Doc. 1, ¶ 31). According to Tyco's
complaint, the net cancellation amount was $4,046,936 (Doc. 1, at 9, ¶ 29; *see also*
Exhibit F (Letter to METCo dated June 5, 2008), Doc. 1, at 43), and under the terms
incorporated in Tyco's Sales Order Acknowledgments, cancellation charges for custom
products "shall be determined at the sole discretion of Seller and may equal 100% of the

amount of the order. . .” (Doc. 1, ¶¶ 21-25, and Exhibit D, Doc. 1, at 37, “Cancellation of a Custom Product.”)

Tyco contends that under the applicable contract terms, it could have demanded in excess of $4 million for METCo’s unilateral cancellation orders (Doc. 1, ¶ 33), but instead, Tyco took all reasonable steps to mitigate its damages, “including cancelling factory orders, deactivating its additional assembly line, and reaching out to component suppliers, and, when permitted, cancelling or returning custom components ordered by Tyco Electronics to fulfill METCo’s orders.” (Id., ¶ 32). On June 5, 2008, Tyco sent METCo a letter outlining its mitigation efforts, and agreeing to cancel METCo’s orders if METCo paid a cancellation fee of $2,965,860. (Doc. 33-1, Exhibit A).

As noted above, METCo admits that it placed orders through Tyco’s network, that the purchase orders contained the provisions alleged by Tyco, and that METCo “adjusted” the orders (Docs. 12 and 33, ¶¶ 19-20, 26). However, METCo contends that its own “4x4x4 policy” developed during the parties’ long-standing relationship trumped the contract terms in Tyco’s Sales Order Acknowledgments (Id., ¶¶ 16-17, 19-23), and that METCo was not obligated to “purchase all of the inventory stated in an initial order.” (Id., ¶ 19) According to METCo:

> Under the terms of METCo and Tyco’s long-standing supplier-purchase relationship, METCo purchased power tool switches using a “just-in-time” forecasting and supplier capacity system (Dkt. 33 at p. 11, ¶ 1.) The parties would negotiate annual prices, METCo would forecast its switch needs on a rolling basis, Tyco would carry enough inventory to fill METCo’s orders and, when necessary, METCo would send Tyco a purchase order for switches. (Id. at ¶ ¶ 3, 4.) The

possibility that METCo might reduce the number of switches on order created a risk that Tyco could end up with excess finished inventory, work-in-process or raw materials inventory. To share that risk, METCo established what it called the "4x4x4 policy." Under that policy, if METCo reduced the number of products on order it would still be obliged to pay for 4 weeks of finished goods, 4 weeks of work-in–process and 4 weeks of raw materials Tyco had on hand, or 12 weeks of Tyco's inventory, but no more than that (*Id*. at p. 3, ¶ 16).

METCo's Response to Motion to Dismiss, Doc. 43, at 7-8.

The parties negotiated for several months in an attempt to settle their dispute about the cancelled orders. The documents show that representatives of the parties engaged in numerous telephone conferences and meetings in an attempt to settle their dispute. The six pre-suit letters attached as exhibits reflect the discussions and show that the parties exchanged detailed offers and counteroffers between July 24, 2008 (Exhibit A, Doc. 33-1) and January 5, 2009. (Exhibit F, Doc. 37-6.) After suit was filed on August 30, 2010, the parties continued to discuss terms of a possible settlement (Letters dated December 10 and December 17, 2010, Exhibits G and H, Docs. 37-7 and 37-8.)

As noted, Tyco filed the instant suit on August 30, 2010.

### C. Issue One: Tyco's Motion to Dismiss Counterclaims II, III, and IV

Tyco contends the court should dismiss METCo's Counterclaim II (breach of contract based upon settlement agreement), Counterclaim III (promissory estoppel), and Counterclaim IV (unjust enrichment) on grounds that METCo fails to allege sufficient facts to present plausible claim of settlement, and that the "indisputably authentic documents" demonstrate that no settlement occurred.

11

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of claims

that fail to assert a basis upon which relief can be granted. When considering a motion to

dismiss, the court must "accept all [of the plaintiff's] factual allegations as true, construe

the complaint in the light most favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v.*

*County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings*

*Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). *See also Matrixx Initiatives, Inc. v.*

*Siracusano*, 131 S. Ct. 1309, 1322–23 (2011) (applying the Rule 12(b)(6) standard).

The complaint must set forth sufficient facts to "state a claim to relief that is plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The question is not

whether the plaintiff will ultimately prevail, but whether the "complaint [is] sufficient to

cross the federal court's threshold." *Skinner v. Switzer*, 131 S.Ct. 1289, 1296 (2011)

(citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002)).

Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing

that the pleader is entitled to relief," a plaintiff must do more than present "bald

assertions" and "legal conclusions." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d

1410, 1429–30 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617,

628 (1st Cir. 1996)).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does
> not need detailed factual allegations, *a plaintiff's obligation to provide*
> *the "grounds" of his "entitle*[ment] *to relief" requires more than labels*
> *and conclusions, and a formulaic recitation of a cause of action's*

*elements will not do.* Factual allegations must be enough to raise a right
to relief above the speculative level on the assumption that all the
allegations in the complaint are true . . . .

*Twombly*, 550 U.S. at 555 (alteration in original) (emphasis added) (citations omitted).

Plaintiffs must nudge their claims "across the line from conceivable to plausible." *Id.* at

570. *See also Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)

(reviewing *Twombly*).

A plaintiff "armed with nothing more than conclusions" is not entitled to discovery.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Consequently, "where the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'"

and the complaint should be dismissed. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in

original).

The "plausible grounds" requirement "does not impose a probability requirement at

the pleading stage; it simply calls for enough fact to raise a reasonable expectation that

discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly*, 550

U.S. at 556. Determining plausibility is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at

1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007), *rev'd on other grounds*,

129 S. Ct. at 1937).

13

The Third Circuit has outlined a two-part analysis that courts should use when deciding a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the factual and legal elements of a claim should be separated. In other words, while courts must accept all of the complaint's well-pleaded facts as true, they may disregard any legal conclusions. Second, courts then decide whether the facts alleged in the complaint are sufficient to demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 210 (quoting *Iqbal*, 129 S. Ct. at 1950) (internal quotation marks omitted). That is, a complaint must do more than allege the entitlement to relief; its facts must show such an entitlement. *Id.* at 211.

Each of the counterclaims will be addressed in turn.

### (1) Counterclaim II: Breach of Contract—Settlement Agreement

Tyco contends that METCo "has failed to plead factual content presenting a facially plausible argument that the parties reached a settlement agreement in this dispute as required by . . . *Iqbal* and *Twombly*." ([Doc. 37](), at 16.)

Indeed, METCo's Counterclaim II, on its face, lacks sufficient non-conclusory allegations to establish that a settlement occurred. METCo's amended answer sets out a number of prefatory factual allegations in support of its four counterclaims. Those relevant to the claim of settlement are as follows:

> 12.   On July 24, 2008 Tyco wrote to METCo employee Tom Mastaier that it had worked "aggressively to minimize charges," that the materials now in its possession were valued at only $397,520 and that METCo could eliminate

the remainder of Tyco's claim by purchasing additional switches valued at $1,039,504. (Attached hereto as Exhibit A).

13.     On August 11, Tyco wrote to METCo employees Rob Borowski and Art LaMountain that METCo could resolve the parties' dispute for an adjusted order of $929,957 of additional switches, support payments of $63,022 to convert work-in-process to finished goods, support payments of up to $100,000 for additional finished goods in route to Tyco and a final purchase order of $883,142 to purchase raw materials Tyco housed in Mexico. (Attached hereto as Exhibit B).

14.     In response to Tyco's proposal, METCo orally agreed to send Tyco additional switch purchase orders valued at $1.1 million dollars and to inspect and then purchase any of the Tyco raw material and unused components that was attributable to METCo.

15.     METCo and Tyco complied with that oral agreement. METCo ordered and paid for, and Tyco delivered, additional switches valued at $1.1 million. METCo inspected the raw materials in Tyco's possession in April 2009.

(Doc. 33, at 12-13, ¶¶ 12-15).

METCo's factual allegations allege only that the parties "could resolve" their dispute; that METCo ordered and paid for additional switches, which Tyco delivered, and that METCo also agreed "to inspect and then purchase any of the raw material and unused components that was attributable to METCo." The factual allegations use the language of negotiation: "could eliminate" (¶ 12), "could resolve" (¶ 13), "*METCo* orally agreed" and "*Tyco* complied"  (¶ 14), and "METCo inspected the raw materials" (¶ 15). At most, METCo's alleged facts state that preliminary negotiations took place and the parties took some concrete steps to try to resolve the dispute.

"The enforceability of settlement agreements is ordinarily determined by general principles of contract law." *Pulcinello v. Consol. Rail Corp.*, 784 A.2d 122, 124 (Pa. Super. 2001) (citing *Century Inn, Inc. v. Century Inn Realty, Inc.*, 516 A.2d 765 (Pa. Super 1986)). Settlement agreements do not need to be reduced to writing to become enforceable, but "preliminary negotiations do not constitute a contract." *Kazanjian v. New England Petroleum Corp.*, 480 A.2d 1153, 1157 (Pa. Super. 1984); *Pulcinello*, 784 A.2d at 124. In order to be binding and enforceable, an oral settlement must include each essential term of the agreement. *Kazanjian*, 480 A.2d at 1157 (citing *Melo-Sonics Corp. v. Cropp*, 342 F.2d 856, 859–60 (3d Cir. 1965), and *Field v. Golden Triangle Broad. Corp.*, 305 A.2d 689 (1973)).

METCo does not allege sufficient facts to state a plausible claim that the parties agreed to "each essential term of the agreement." *Id.* Furthermore, an examination of METCo's Claim II "Breach of Contract - Settlement Agreement" claim reinforces this conclusion. METCo alleges:

22.  METCo and Tyco entered into a settlement agreement in August 2008 to resolve the disputes involving METCo's adjustments.

23.  METCo fulfilled its obligations under the settlement agreement, which included purchasing switches at an inflated price.

24.  Tyco was obligated to consider all or part of its dispute with METCo resolved and to not pursue litigation of settled claims.

25.  Tyco breached the settlement agreement by filing a lawsuit against METCo in August 2010 stemming from the dispute fully or partly settled in 2008.

16

(*Id.,* at 13, ¶¶ 22-25).

METCo's allegation in ¶ 22 that "METCo and Tyco entered into a settlement agreement in August 2008" is conclusory and unsupported by the factual allegations discussed above. Rule 8(a)(2) requires more than "bald assertions" and "legal conclusions." *In re Burlington*, 114 F.3d at 1429–30. A plaintiff must allege more than "labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555).

Furthermore, METCo's statement of Claim II, by its own terms, rules out the existence of a contract under Pennsylvania law. METCo alleges that Tyco should have considered "all or part" of the dispute resolved, and that the dispute had been "fully or partly" settled in 2008. (Doc. 33, at 14, ¶¶ 24-25). A settlement requires agreement on all "essential terms," and METCo therefore has failed to allege sufficient facts to state a counterclaim based upon settlement.

Even if the court concluded that METCo's Counterclaim II alleged sufficient facts on its face, it fails to meet the "plausibility" requirement under *Iqbal* and *Twombly* considering exhibits upon which METCo relies. Neither of the exhibits attached by METCo to its counterclaim indicates any final agreement between the parties to settle the dispute. (Exhibits A and B, Doc. 33-1.) Exhibit A is a letter dated July 24, 2008 from Tyco's Mark Fratterole to METCo's Thomas Mastaier acknowledging a conference call on July 9, 2008 during which "METCo agreed to supply Tyco Electronics with a list of

additional switches METCo was interested in having built . . . in an effort to reduce the imposed cancellation charges." (Exhibit A, Doc. 33-1, at 2-3). Tyco states it "performed an in-depth analysis" and that reduced cancellation charges "would only be in effect" if METCO placed additional switch orders and paid for goods which Tyco had built pursuant to the cancelled orders, among other terms. The letter continues, "[s]hould METCO wish to move forward with the build in order to lessen the cancellation charges, please advise us by Monday, July 28 or Tuesday, July 29 at the latest." (*Id.*) The letter closes with the statement, "[i]f METCO chooses to forego the build, the net cancellation fee of $2,965,860 stands . . ." (*Id.*)

The second letter, dated August 11, 2008, is from Fratterole to Rob Borowski and Art LaMountain at METCo. By its own terms, it is a "counterproposal" to "the METCO settlement proposal" requiring payments by METCo totaling $2,079,640. (Exhibit B, Doc. 33-1, at 5-6). Fratterole wrote, "[p]lease keep in mind that the original Tyco Electronics cancellation charges were $4,046,936. We have worked aggressively to minimize these charges and are providing this final proposal as a fair and reasonable counteroffer to allow us to cover the remaining costs while building additional parts requested by METCo . . ." (*Id.*, at 5). The letter closes with the statement that Tyco "looks forward to resolving these issues this week." (*Id.*)

Clearly, the two letters METCo attached to its counterclaims do not support METCo's conclusory allegations that the parties had agreed on the essential terms of a settlement.

18

Furthermore, the additional six letters submitted by Tyco show that settlement negotiations continued for more than two years without any agreement to final terms. (*See* Exhibits A-H, Docs. 37-1 through 37-8.) The last letter is dated December 17, 2010, several months after suit was filed. (*Id.*, Exhibit H, Doc. 37-8). It appears that settlement negotiations foundered upon a disagreement about whether components and raw materials Tyco stored at a facility in Mexico were related to METCo's canceled purchase orders. (*See* Exhibit G, Doc. 37-7, at 3.)

As noted above, METCo alleges that as the result of the settlement discussions, it ordered and paid for $1.1 million worth of additional switches, which were built and delivered by Tyco. (Doc. 33, at 13, ¶¶ 14-15). While these assertions do not state a claim for the existence of a settlement, they might provide grounds for a credit, recoupment, or setoff if properly presented to the court.[2]

For the reasons stated, it is recommended that METCo's Counterclaim II for breach of a settlement-agreement contract be dismissed.

### (2) Counterclaim III: Promissory Estoppel

METCo's counterclaim for promissory estoppel is based upon the same factual allegations discussed above. METCO contends it "acted in reliance on Tyco's promise to

---

[2] For a discussion of setoff and recoupment under Pennsylvania law, *see Kaiser by Taylor v. Monitrend Inv. Management, Inc.* 672 A.2d 359, 362-363 (Pa.Cmwlth.,1996). *See also Kline v. Blue Shield of Pennsylvania*, 556 A.2d 1365, 1368-69 (Pa.Super.,1989) *quoting Pennsylvania R. Co. v. Miller*, 124 F.2d 160, 162 (5th Cir.1942); *Household Consumer Discount v. Vespaziani,* 490 Pa. 209, 415 A.2d 689, 694 (1980).

settle the dispute and fulfilled (sic) its obligations under the settlement agreement." (Doc. 33, at 15, ¶ 30). METCo fails to point to any support for the conclusory allegation that Tyco "promised to settle" the dispute if METCo placed an additional order for switches.

In Pennsylvania, a claim for promissory estoppel requires three elements: (1) "the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee"; (2) the promisee took action or refrained from action in reliance on the promise; and (3) enforcing the promise is the only way to avoid injustice. *Piper v. Am. Nat. Life Ins. Co.*, 228 F. Supp. 2d 553, 562 (M.D. Pa. 2002) (Kane, J.) (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)).

METCo's allegations of a "promise to settle" are conclusory, and are contradicted by the exhibits which indisputably reflect ongoing, and unresolved, discussions regarding settlement. METCo has failed to set forth sufficient facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. When attacked by a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

Accordingly, it is recommended that METCo's Counterclaim III for promissory estoppel be dismissed.

20

### (3) Counterclaim IV: Unjust enrichment

The doctrine of unjust enrichment under Pennsylvania law has three elements: (1) a conferring of benefits by the complainant to the opposing party; (2) retention and appreciation of such benefits by the opposing party; and (3) circumstances such that it would be inequitable for the opposing party to retain those benefits without the payment of value. *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006) (quoting *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. 2001)). As the name of the doctrine implies, the most significant element is whether the opposing party's enrichment was *unjust*; "the doctrine does not simply apply because the [opposing party] may have benefited as a result of the actions of the [complainant]." *Id.* (quoting *AmeriPro Search*, 787 A.2d at 991).

The basis of METCo's unjust-enrichment counterclaim is ambiguous. However, either way it is construed, it fails to state a plausible claim. If METCo bases the unjust enrichment counterclaim on an alleged settlement agreement, it fails for the reasons discussed above as to Counterclaims II and III. If the counterclaim is based upon METCo's alleged additional purchase of switch products, it fails because METCo admits that Tyco delivered "additional switches valued at $1.1 million." (Doc. 33, at 13, ¶ 15). Thus, there has been no conferring of a benefit from METCo to Tyco without a corresponding benefit being conferred from Tyco to METCo.

21

Moreover, if METCo's unjust-enrichment claim is predicated on its allegation of a contract between it and Tyco, such a claim cannot succeed here, since the doctrine of unjust enrichment is, "[b]y its nature, . . . inapplicable where a written or express contract exists,". *Lackner*, 892 A.2d at 34 (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super 2009)). Indeed, the possibility of an unjust-enrichment claim only arises "in the absence of an agreement." *Id.* (quoting *AmeriPro Search*, 787 A.2d at 991)). And in this case, underlying the entire dispute is an express contract for the purchase of products by METCo from Tyco, a contract that both parties admit exist.

Accordingly, it is recommended that Tyco's motion to dismiss METCo's Counterclaim IV for unjust enrichment be granted.

### (D)   Issue Two: Tyco's Motion to Strike ¶ 8 of METCo's Affirmative Defense based upon settlement

Tyco requests that the court strike ¶ 8 of METCO's affirmative defenses. The defense states as follows:

8.   Alternatively, the parties' August 2008 agreement constituted a settlement of Tyco's claims and all or some of Tyco's current claims were released and waived by that settlement agreement. METCo fulfilled its obligations under the settlement agreement by paying the plaintiff $1.1 million for additional products and inspecting the raw materials at the Mexico warehouse and, accordingly, plaintiffs' claims are barred or limited under the doctrines of waiver, estoppel and/or accord and satisfaction.

(Doc. 33, p. 9, ¶ 8).

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.*

Motions to strike are generally viewed with disfavor because of their potential as a dilatory tactic. *United States v. Marisol, Inc.*, 725 F. Supp. 833, 836 (M.D. Pa. 1989) (Nealon, J.) (citing *Am. Standard Life & Accident Ins. Co. v. U.R.L., Inc.*, 701 F. Supp 527, 531 (M.D. Pa. 1988) (Caldwell, J.)).

A Rule 12(f) motion "should not be granted when the sufficiency of the defense" the movant seeks to have striken "depends on disputed issues of fact or unclear questions of law." *Id.* (citing *United States v. 187.50 Acres of Land*, 481 F. Supp. 54, 56 (M.D. Pa. 1974) (Nealon, J.)). However, a motion to strike under Rule 12(f) is the "primary procedure" for objecting to an insufficient affirmative defense, and serves "a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." *Marisol*, 725 F. Supp. at 836, *citing United States v. Geppert Bros., Inc.*, 638 F.Supp. 996, 998 (E.D.Pa.1986).

As noted, METCo's ¶ 8 offers three alternative theories to bar or limit Tyco's claims: "waiver, estoppel, and/or accord and satisfaction." An accord and satisfaction is a substitute contract between a debtor and creditor for the settlement of a debt by some means other than full payment of the debt. *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 (3rd Cir.1999). *See Also*: RESTATEMENT (SECOND) OF CONTRACTS, § 281 (1981). *Fleming v. CNA Ins. Co.*, 52 F.Supp.2d 499, 502 (E.D.Pa.1999). Three elements are required to show an accord and satisfaction defense: (1) a disputed debt; (2) a clear and

23

unequivocal offer of payment in full satisfaction; and (3) acceptance and retention of

payment by the offeree-creditor. *Id.*; *PNC Bank v. Balsamo*, 430 Pa.Super. 360, 634 A.2d

645, 680–81 (Pa.Super.Ct.1993); *Occidental Chemical Corporation v. Environmental*

*Liners, Inc.*, 859 F.Supp. 791, 793 (E.D.Pa.1994).

It is clear that METCo's assertion of accord and satisfaction is an "insufficient

defense" for the reasons discussed above. There is no allegation, much less a showing,

that METCo made a "clear and unequivocal offer of payment in full satisfaction" of the

disputed debt and that Tyco accepted the offer. To the contrary, METCo fails to allege

any clear understanding between the parties regarding resolution of the dispute

surrounding METCo's cancellation of orders in early 2008. Furthermore, the exhibits

make clear that no agreement was reached, either as to settlement, or an accord and

satisfaction.

Likewise, METCo fails to offer any factual allegation to support the asserted defenses

of waiver or estoppel based upon settlement.

Accordingly, it is recommended that the court grant the motion to strike.

### (E)        Issue Three:  Tyco's motion for Rule 11 sanctions against METCo

Federal Rule of Civil Procedure 11 provides for the imposition of sanctions upon

an attorney or party for the filing of a claim or motion that is "patently unmeritorious or

frivolous." *Arab African Int'l Bank v. Epstein*, 10 F.3d 168, 175 (3d Cir. 1993) (citing

24

*Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988),

and *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987)). The Rule provides:

> **(b) Representations to the Court.**
> By presenting to the court a pleading, written motion, or other paper . . .
> an attorney certifies that to the best of the person's knowledge,
> information, and belief, formed after an inquiry reasonable under the
> circumstances:
>
> (1)   it is not being presented for any improper purpose, such as to
>       harass, cause unnecessary delay, or needlessly increase the cost of
>       litigation;
>
> (2)   the claims, defenses, and other legal contentions are warranted by
>       existing law or by a nonfrivolous argument for extending,
>       modifying, or reversing existing law or for establishing new law;
>
> (3)   the factual contentions have evidentiary support or, if specifically
>       identified, will likely have evidentiary support after a reasonable
>       opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11. A court tests conduct under Rule 11 for "reasonableness under the

circumstances." *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68

(3d Cir. 1988). An attorney who fails "competently to research the law before filing" may

face penalties under the Rule. *Doering*, 857 F.2d at 195.

Rule 11 sanctions are generally appropriate only in the "exceptional circumstance"

that a claim, motion, or other paper "has absolutely no chance of success," although a

finding of the signer's bad faith is not required. *Doering*, 857 F.2d at 194 (citing *Gaiardo*,

835 F.2d at 483, *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986), and

*Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986)). A finding of frivolousness is a

25

prerequisite to any imposition of sanctions. *Id.* at 195. Once a court finds a violation of Rule 11, the imposition of sanctions is mandatory. *Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77, 83 (E.D. Pa. 1992) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), *Perkins v. Gen. Motors Corp.*, 129 F.R.D. 655, 658 (W.D. Mo. 1990), and *Matthews v. Freedman*, 128 F.R.D. 194, 206 n.3 (E.D. Pa. 1989)).

In its brief supporting its motion for sanctions, Tyco contends that METCo's filing of an amended answer was "merely a dilatory tactic contrived to avoid the Court's grant of judgment on the pleadings and to increase the cost and burden of litigation." (Pl.'s Br. in Supp. of Mot. for Sanctions 20, Doc. 40, at 24.)

As indicated above, the undersigned is recommending that the court dismiss METCo's Counterclaims II, III and IV, and strike METCo's affirmative defense at ¶ 8. However, METCo's Counterclaim I survives, as do a number of other affirmative defenses contained in METCo's amended answer. While the undersigned concludes that Counterclaims II, III and IV did not meet the pleading requirements under *Iqbal* and *Twombly*, it is less clear that METCo presented the claims for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Further, there are no "exceptional circumstances" that would warrant Rule 11 sanctions. Accordingly, the undersigned recommends that the court deny the motion for Rule 11 sanctions.

26

## IV. Conclusion

For the foregoing reasons, it is recommended that this Court rule on Tyco's motions as

follows:

(1)  GRANT Tyco's motion to dismiss Counterclaims II, III, and IV, and to strike ¶ 8
     of the affirmative defenses; and

(2)  DENY Tyco's motion for sanctions under Rule 11.

Signed onFebruary 21, 2012.


_____

MILDRED E. METHVIN
UNITED STATES MAGISTRATE JUDGE